1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT
8      FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   LUIS GONZALES,                        No. C 04-5474 CW
11              Petitioner,
12      v.                                 ORDER DENYING
                                           PETITION FOR WRIT
13   THOMAS L. CAREY, Warden,              OF HABEAS CORPUS
14              Respondent.
15
16   _____/
17
18                        INTRODUCTION
19      Petitioner Luis Gonzales, an individual formerly incarcerated
20   at California State Prison, Solano (CSP, Solano), petitions for a
21   writ of habeas corpus under 28 U.S.C. § 2254 on several grounds.
22   Respondent D.K. Sisto, Warden of CSP, Solano, opposes the
23   petition.[1]  The Court DENIES Gonzales' petition for a writ of
24   habeas corpus.
25                         BACKGROUND
26      Unless indicated otherwise, the following facts are taken from
27   _____
28      [1]The Court substitutes the current warden, D.K. Sisto, for
     Thomas Carey as Respondent.

United States District Court
For the Northern District of California

the state appellate court's unpublished opinion ruling on Gonzales'

direct appeal.  Respondent's Exhibit 7, App. A.

Gonzales owned an auto body shop at 1409 104th Avenue in

Oakland.  On September 1, 1998 at approximately 8:20 PM, Gonzales

shot and killed his former neighbor Jose Tenorio on the street near

the shop.  Gonzales was charged with murder with personal use of a

handgun and discharge of a handgun causing great bodily injury.

Gonzales claimed that he acted in self-defense.

At trial, the prosecution presented the testimony of several

eyewitnesses.  The California Court of Appeal summarized the

prosecution's case as follows:

> At the time of the killing, Ricardo Munoz was
> parked in his truck with his then-girlfriend Maria
> Medina, in front of her house at 1429 104th Ave.  He
> heard two gunshots, one right after the other, and
> looked to see where they came from.  He saw a man on
> the ground and another man pointing a pistol at the man
> on the ground.  The man with the pistol took one or two
> steps toward the man on the ground and shot him a third
> time, from a distance of six feet, holding the gun at
> about a 60-degree angle to the ground.  The area was
> illuminated by a streetlight, and the gunman was close
> enough to Munoz's truck that Munoz was afraid the
> gunman would hear him calling 911 on his cell phone.
> Munoz did not hear anyone arguing, or see anyone
> fighting, before the shooting.
> Maria Medina also heard the shots.  She saw a man,
> whom she identified as defendant, shooting a man as he
> was falling to the ground.  She heard several shots
> "like fast," and then a final shot a moment, or a few
> seconds, later.  She saw defendant fire the last shot;
> the victim was already on the ground as defendant
> fired.  Defendant fired down toward Tenorio, holding
> the gun at an angle of 60 degrees.  Defendant then
> walked back inside his shop.  The area was lit by at
> least one streetlight.
> Maria testified about a history of conflict
> between defendant and Tenorio.  The two men had a
> dispute over Tenorio's keeping roosters, or cocks, on
> defendant's vacant lot next to his body shop.  Tenorio
> kept the cocks in cages on the lot and held cockfights

2

on weekends.[2]  On May 15, 1998, three and a half months before the killing, Tenorio chased defendant around a car with a long-handled hoe.  Tenorio struck the car with the hoe while he was trying to strike defendant.  During the incident the two were arguing.

Defendant's neighbor, Agustin Galvan, witnessed the shooting.  Galvan had been cleaning a vacant apartment and taking out the trash.  He saw defendant walk out of his body shop and across the street, "[a] little bit in a hurry."  Defendant walked up to Galvan and greeted him and another neighbor, Mario Jones, as they stood near Galvan's pickup truck.  Tenorio was also in the group.  When defendant saw Tenorio, defendant looked serious, worried, and pale.  Defendant told Tenorio, "The threats are going to stop."  Tenorio replied, "What do you think."

Tenorio then moved away from the truck, holding his hands at about waist level with the palms facing forward.  He was five or six feet from defendant, and facing him.  He did not move toward defendant.

Without saying anything more, defendant pulled a semiautomatic pistol from his belt, held it with two hands, and shot Tenorio two or three times.  Tenorio fell back.  "Some seconds" later, and after having walked toward Tenorio, "[h]e bent down and shot him again," in the head, as he lay on the ground.  Then defendant stood up, put away the pistol, and walked away.  But before he left he told Galvan and Jones, "You are going to be witnesses."  Defendant walked back into his body shop.

Galvan did not see Tenorio with a weapon or with anything in his hands.  He did not see Tenorio reach into his pants pocket or waistband, or do anything that looked like he was reaching for a weapon.  Tenorio did not threaten defendant before the shots were fired.

Galvan also testified that there were prior conflicts between defendant and Tenorio.  He confirmed Maria's account of the cockfighting on the vacant lot, and also confirmed the incident concerning the hoe.  He also said the two had a "physical fight" in April 1998.  And apparently defendant had something to do with Tenorio being fired from his job.
. . .

The People presented evidence that defendant attempted to fabricate evidence by trying to get Maria Medina to sign a letter repudiating much of her anticipated trial testimony.  The letter . . . is in the record. . . .  In essence, the letter purports to

---

[2]Defendant rented the lot from its owner, Arturo Lopez.  It is clear from the record that Tenorio used the lot without defendant's permission or approval.

**United States District Court**
For the Northern District of California

> say that Medina was leaning over towards the floor of Munoz' truck and was "distracted" by him, that it was "very dark" and the area was insufficiently lit by streetlights, and that Medina did not really see or hear what happened and shouldn't be a witness.  The letter also purports to say that Medina saw only silhouettes of people and could identify no one, and heard only a volley of shots in rapid succession.
>
>           . . .
>
>           Defendant objected to admitting the letter on the grounds that it did not contradict Maria's testimony and that it was more prejudicial than probative.  (Evid. Code, § 352.)  The court overruled the objection and admitted the letter as evidence of defendant's attempt to fabricate evidence.
>
>           Gustavo [Medina, Maria's brother], testified in the jury's presence that defendant, while released on bail, gave him the letter and asked him to have Maria copy it.  Defendant asked this of Gustavo on several occasions.  Gustavo gave Maria the letter.  She read part of it and gave it back to Gustavo, who returned it to defendant.  Maria never gave Gustavo a copy of the letter in her handwriting.  Gustavo never gave defendant anything from Maria.
>
>           At the conclusion of Gustavo's testimony, a typed English translation of the letter was provided to the jury.

Respondent's Exhibit 7, App. A at 2-5 (some alterations and footnote in original).

The defense called witnesses who testified that Tenorio was a violent individual who had assaulted or threatened various people in the neighborhood and was reputed to carry a knife, gun or machete.  Between April 27, and May 15, 2008, Tenorio had assaulted or verbally abused Gonzales on at least five occasions.  Tenorio had threatened to kill Gonzales many times and had also threatened Gonzales' wife and daughter.

At the time of the shooting, Gonzales was in the process of working with an attorney to file papers seeking a restraining order against Tenorio.  On the day of the shooting, Tenorio had called Gonzales stating that he was sharpening a machete that he intended

4

1    to use to cut Gonzales into little pieces.

2        The California Court of Appeal summarized Gonzales' testimony

3    about the shooting as follows:

4            Defendant left his shop about 8:15 p.m..  Tenorio,
         who no longer lived in the neighborhood, had driven up
5        and parked in front of defendant's shop.  Defendant put
         his daughter in his truck, then saw Tenorio, who was
6        sitting his car.  Tenorio displayed a machete.  Tenorio
         then took a revolver from the glove compartment of his
7        car and put it in his waistband.  He walked to his
         trunk, slammed it, and then walked toward defendant
8        with the machete.  Defendant locked his daughter in the
         truck and walked into his shop to get his gun.
9        Defendant kept the gun because of four or five
         robberies or attempted robberies at his shop.
10           Defendant put his gun in his waistband and walked
         back outside to get his daughter.  He saw Tenorio
11       "hiding behind [a] truck."  He thought Tenorio was
         going to kill him.  Mario Jones and Agustin Galvan were
12       there.  Jones told Tenorio that defendant had a gun.
         Tenorio said he wasn't afraid of defendant and "I've
13       got mine as well."
             Defendant greeted Jones and Galvan.  Defendant
14       then told Tenorio to "please . . . stop the death
         threats toward me and my family."  Tenorio answered,
15       "What are you thinking?" and then moved suddenly, as if
         he was going to take his gun from his waistband.
16       Defendant was scared and thought Tenorio was going to
         kill him.  Defendant pulled out his gun, pointed it at
17       Tenorio, closed his eyes, and fired five or six shots.
         He didn't remember shooting Tenorio once Tenorio was on
18       the ground.  He told Jones and Galvan that "they had
         been witnesses," and returned to his shop.

19   Id. at 8.

20       The trial court instructed the jury on the law of homicide,

21   the defense of self-defense and the lesser included offense of

22   voluntary manslaughter for killing in imperfect self-defense, that

23   is, in the honest but unreasonable belief that one's life is in

24   danger.  The trial court also instructed the jury with California

25   Jury Instruction (CALJIC) No. 2.04, which provides that evidence of

26   a defendant's attempt to fabricate evidence may be considered as a

27

28                                  5

circumstance tending to show consciousness of guilt.

After more than three days of deliberations, the jury found Gonzales not guilty of murder but guilty of the lesser included offense of voluntary manslaughter for killing in imperfect self-defense.  The jury also found that Gonzales personally used a handgun.  After denying Gonzales' motion for a new trial based on juror misconduct, the trial court sentenced him to the middle term of six years for voluntary manslaughter and four years for use of a handgun, for a total of ten years.

On October 9, 2003, the California Court of Appeal affirmed the judgment in an unpublished opinion and rejected Gonzales' claims of trial error based on (1) the prosecutor's use of peremptory challenges to remove two Hispanic prospective jurors from the venire in violation of Gonzales' rights under the Sixth and Fourteenth Amendments; (2) the trial court's use of CALJIC No. 2.04, instructing the jury that it could consider whether Gonzales attempted to fabricate evidence, in violation of due process; and (3) the trial court's denial of Gonzales' motion for a new trial based on allegations of juror misconduct in violation of his rights under the Sixth and Fourteenth Amendments.  On December 17, 2003, the California Supreme Court denied review.  Gonzales' petition for certiorari in the United States Supreme Court was denied as untimely.  Gonzales did not seek collateral review in the state courts.

On December 28, 2004, Gonzales filed his federal petition for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

a writ of habeas corpus.[3]  On July 6, 2005, this Court issued an order to show cause on the three claims addressed by the California Court of Appeal.[4]  On August 16, 2005, Respondent filed a motion to dismiss the petition as not fully exhausted, noting that Gonzales' second claim based on CALJIC No. 2.04 was not presented to the California Supreme Court for review.  The Court granted the motion to dismiss and also granted Gonzales' subsequent request to stay the proceedings while he exhausted his jury instruction claim.  On December 29, 2006, Gonzales informed the Court that his state proceedings had concluded and filed a first amended habeas petition, including his newly-exhausted jury instruction claim.  On January 31, 2007, the Court granted Gonzales' motion to lift the stay and granted him leave to file his first amended petition.

LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

---

[3]Gonzales' "Motion to incorporate record with exhibits" filed in support of his initial petition is GRANTED.  (Docket. No. 17).

[4]In his traverse, Gonzales appears to challenge his sentence and to raise various other claims.  However, such claims are neither exhausted nor properly presented because they appear for the first time in Gonzales' traverse.  The Court will address only the three claims addressed by the Court of Appeal.

States;[5] or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

"Clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 412 (2000).   A state court decision may not be overturned on habeas review simply because of a conflict with circuit-based law. Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).   However, circuit court decisions may be persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Id.; see also Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 124 S. Ct 446 (2003); Moore v. Calderon, 108 F.3d 261, 264 (9th Cir. 1997).

A state court's decision is "contrary to" Supreme Court law if the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or reaches a different conclusion based on facts indistinguishable from a Supreme Court case. Williams, 529 U.S. at 412-13.   A state court's decision constitutes an "unreasonable application" of Supreme Court precedent if the state court "either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way

_____

[5] Both prongs of § 2254(d)(1) apply to questions of law and mixed questions of law and fact. Van Tran v. Lindsey, 212 F.3d 1143, 1150 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-74 (2003).

United States District Court
For the Northern District of California

that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." <u>Id.</u> at 407. An "unreasonable application" of federal law is different from an incorrect or erroneous application of federal law. <u>Id.</u> at 412. Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. The reasonableness inquiry under the "unreasonable application" clause is objective. <u>Id.</u> at 409.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court considered only state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. <u>See Lockhart v. Terhune</u>, 250 F.3d 1223, 1230 (9th Cir. 2001). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. <u>Id.</u> at 1232.

DISCUSSION

I.   Motion for a new trial

On October 26, 2001, two days after the jury reached its

United States District Court
For the Northern District of California

verdict, Juror 4 contacted defense counsel.   Juror 4 filed a

declaration stating that

> during jury deliberations and prior to the verdict I
> spoke to an attorney friend and asked him if he knew
> what sentence or punishment Mr. Gonzalez would receive
> if he was convicted of voluntary manslaughter.   My
> attorney friend advised me that he believed Mr.
> Gonzalez would receive three or possibly six years in
> state prison and serve fifty percent of his sentence
> . . . .  [B]ased on this information, I changed my vote
> from not guilty because of self defense[] to guilty of
> voluntary manslaughter. . . .  [I]f I had known that
> Mr. Gonzalez could receive up to twenty one years in
> state prison, I would not have changed my vote of Not
> Guilty.

Clerk's Transcript (C.T.) at 1138.

Gonzales filed a motion for a new trial based on the

information contained in the declaration.   At the hearing on the

motion, Juror 4 asserted his Fifth Amendment privilege against

self-incrimination.   The prosecution refused to offer him immunity.

Therefore, the only potential factual basis for Gonzales' motion

was the declaration.   The trial court found that certain portions

of the declaration were admissible under the hearsay exception for

declarations against interest.   In particular, the trial court

found admissible the portions of the declaration establishing that

(1) Juror 4 had spoken to an attorney and (2) the attorney told

Juror 4 that he believed Gonzales would be sentenced to three to

six years in prison and serve fifty percent of such a sentence if

convicted of voluntary manslaughter.[6]  However, the trial court

found that those portions of the declaration describing the impact

of the information on Juror 4's conduct were inadmissible under

---

[6]Apparently, the juror's understanding was not entirely
correct.

California Evidence Code § 1150, which provides,

> Upon an inquiry as to the validity of a verdict, any
> otherwise admissible evidence may be received as to
> statements made, or conduct, conditions, or events
> occurring, either within or without the jury room, of
> such a character as is likely to have influenced the
> verdict improperly.  No evidence is admissible to show
> the effect of such statement, conduct, condition, or
> event upon a juror either in influencing him to assent
> to or dissent from the verdict or concerning the mental
> processes by which it was determined.

Cal. Evid. Code § 1150(a).  Those portions of the juror's

declaration would also be inadmissible under Federal Rule of

Evidence 606(b).

The trial court found that Juror 4's communication with his

attorney friend constituted juror misconduct and proceeded to

determine whether the misconduct was prejudicial.  Ruling from the

bench, the trial court stated,

> I am mindful of the fact that information concerning
> potential penalty and punishment is widely broadcast in
> the newspapers, public media, in books, on television,
> et cetera; there is speculation, and I frankly do not
> find this to be prejudicial.  This particular
> information is almost actually a matter of public
> knowledge what the punishment for a voluntary
> manslaughter sentence is.  And to the extent that
> [Juror 4] may have misinterpreted this information I
> cannot speculate as to whether or not his
> misinterpretation was so extreme as to be prejudicial
> to the defendant.

Reporter's Transcript (R.T.) at 1288.

The California Court of Appeal agreed that the information

Juror 4 learned from his attorney friend was not "inherently

prejudicial."  Respondent's Ex. 7, Ex. A at 20.  Although the Court

of Appeal noted that "the sentence for manslaughter may not be as

widely known as the trial court suggested," it agreed that "the

mere knowledge of that penalty cannot be said, in and of itself, to

11

mandate a finding of prejudice."  Id.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  This guarantee requires that the jury verdict be based on the evidence presented at trial.  See Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); Jeffries v. Wood, 114 F.3d 1484, 1490 (9th Cir.) (en banc), cert. denied, 522 U.S. 1008 (1997).  Jury exposure to extrinsic material deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment.  See Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995).  But a petitioner is entitled to habeas relief only if it can be established that the exposure to extrinsic material had "'substantial and injurious effect or influence in determining the jury's verdict.'"  Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht, 507 U.S. at 623).

Gonzales first argues that the California courts' exclusion of the portions of Juror 4's declaration discussing the impact of the extraneous information was improper.  Gonzales asserts that, while such statements are generally inadmissible under Federal Rule of Evidence 606(b), the information should have been admitted as a statement against interest.  However, Gonzales cites no authority for using a hearsay exception to allow evidence barred by Rule 606(b).

Gonzales next argues that the finding that the juror misconduct was not prejudicial was an unreasonable application of Supreme Court law.  The Court of Appeal held that the finding of a

United States District Court
For the Northern District of California

lack of prejudice was particularly proper "given the state of the

evidence," which it described as follows:

> This case is not as close as defendant contends.
> Several eyewitnesses saw defendant fire several shots
> at Tenorio who was unarmed, and then stand over him
> and deliver a <u>coup de grace</u>.  We see no abuse of
> discretion in the trial court's determination that the
> juror misconduct did not prejudice defendant.  As
> outlined in <u>Carpenter</u>, we look at the entire record
> including the nature of the juror's conduct, the
> circumstances under which the information was
> obtained, the instructions the jury received, the
> nature of the evidence and issues at trial, and the
> strength of the evidence against the defendant.  The
> presumption of prejudice here is rebutted because
> there is extremely strong proof in support of the
> verdict and the jurors were properly instructed on how
> to carry out their duties.

<u>Id.</u> (footnote and internal citation omitted).

The jury was correctly instructed that it was not to consider
the sentence in its decision as to guilt.  Based on the only
evidence that was admissible -- that Juror 4 committed misconduct
and received partially incorrect information about the possible
sentence -- the state courts did not unreasonably find that
Petitioner was not prejudiced.  While Juror 4 proffered testimony
about the impact his discussion with his attorney friend had on his
verdict, it is not clear whether Juror 4 thought Petitioner was
guilty of voluntary manslaughter but was reluctant to say so until
he was assured that the sentence would not be longer than he
thought fair, or whether he thought Petitioner was innocent but was
willing to find him guilty anyway as long as the sentence would not
be too onerous.  This is the type of evidence that is inadmissible
as a policy matter in both state and federal court.

13

**United States District Court**
For the Northern District of California

II.   <u>Batson</u> Claim

The use of peremptory challenges by the prosecution to exclude cognizable groups from a petit jury may violate the Equal Protection Clause.  <u>Georgia v. McCollum</u>, 505 U.S. 42, 55-56 (1992). The Supreme Court has held that the Equal Protection Clause forbids challenging potential jurors solely on account of their race. <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986).  Under <u>Batson</u>, a challenge to a peremptory strike is evaluated in three steps. First, the defendant must make a prima facie showing that the prosecutor exercised the peremptory challenge because of race. <u>Id.</u> at 96-97.  Second, if the defendant makes such a showing, the burden shifts to the prosecutor to come forward with a race-neutral explanation for the challenge.  <u>Id.</u> at 97.  Third, the court must determine whether "the defendant has established purposeful discrimination."  <u>Id.</u> at 98.

Gonzales argues that the trial court violated his right to equal protection when it denied his motion for a mistrial after the prosecution struck Luis G. and Concepcion J., the only two Hispanic venire persons who had been seated in the jury box up to that point.

A.   Facts

1.   Luis G.

Luis G. studied sociology in his home country of Peru and history in France before coming to the United States.  At the time of Gonzales' trial, Mr. G. had been in the United States for twelve years.  His wife still lived in Peru.  He had been unemployed for approximately four months after failing to pass probation for a job

14

with the postal service.  Mr. G. repeatedly stated that he would be "uncomfortable" if asked to sit on the jury.  When the prosecutor asked him about how he felt about the possibility of being a juror in a murder case, Mr. G. replied, "I don't like it at all."  R.T. 1429.  Mr. G. also stated, "I feel like I don't want to be in a murder case.  I don't want to be sitting here as a juror.  I don't feel that is my position.  So judging other people is something that would be really difficult for me."  R.T. 1430.

The prosecutor used a peremptory challenge to remove Mr. G. from the jury as soon as he was seated.

> 2.    Concepcion J.

Concepcion J. was a Mexican-American woman who had taught sociology at California State University in Hayward.  At the time of Gonzales' trial, Ms. J. was working as a policy analyst for the University of California Office of the President.  When the prosecutor asked her for her thoughts on being a juror in a murder case, Ms. J. responded, "I have mixed feelings.  I don't relish the idea of sitting in judgment of someone else."  R.T. 1444.  In addition, Ms. J. disclosed that she had a relative "whose spouse stalked and harassed her."  R.T. 1445.

The prosecutor used a peremptory challenge to remove Ms. J. from the jury as soon as she was seated.

> 3.    Defendant's Motion

After the prosecution removed Ms. J. from the jury, the defense objected and moved for a mistrial pursuant to People v. Wheeler, 22 Cal. 3d 258 (1978), the California equivalent of Batson.  The trial court found that the defense had established a

United States District Court
For the Northern District of California

prima facie case of a constitutional violation because two of the four peremptory challenges exercised by the prosecution struck "the only two Latinos who to that time ha[d] been called." R.T. 1460. Therefore, the trial court asked the prosecutor "to explain the reasons for his challenges of both these jurors." <u>Id.</u>

The prosecutor first stated, "I had both jurors based solely on their questionnaires as no before I even spoke to them." <u>Id.</u> He went on to explain his decision to strike Ms. J. as follows:

> [F]or lack of a better explanation she reminded me of my wife. When I first got this case I told my wife what the facts were and she said I would vote not guilty in this case. She says I wouldn't have women as jurors in this case because of the fact situation that you told me. Compounded by the fact that [] she [] recently found out she is pregnant. Her field is sociology which to me would tell liberal tendencies.
> Also more importantly, there's going to be a defense allegation that the victim deserved to get what he got because of the victim stalking and harassing the Defendant in this case. Also, very, very important was her questions and answers concerning the family member who was victimized by a stalking and she said that he should have gotten it sooner and he should have been incarcerated sooner because he would have prevented future problems. . . . There are just too many things leaking into her ability to be the kind of juror that I am looking for in this case. Like I said, I wouldn't want my wife given her background to be a juror in the case that I am presenting.

<u>Id.</u> at 1460-61.

With respect to Mr. G., the prosecutor explained,

> The reason for him is he can't hold a job. If someone can't make post office probation – he said he couldn't get through the probation thing for the post office. He was only there two months and they let him go. You look at his other jobs, it strikes me for someone with his education that it just smacks of a problem juror. Also his wife has psychology background as well.
> What I have here is someone that can't hold a job and is highly educated. He was educated in sociology like the other juror and then [] history in Europe. If you can't get hired by the post office, I don't

16

want him on my jury.

<u>Id.</u> at 1461-62.  The trial court stated, "If I recall, maybe a couple years ago you told me a juror – if he was hired by the post office you didn't want him on your jury."  <u>Id.</u> at 1462.  The court then asked the prosecutor, "Anything else with regard to Mr. G[.]?"  <u>Id.</u>  The prosecutor responded, "No.  The questionnaire and the voir dire speak for themselves."  <u>Id.</u>  Although the trial court described the prosecutor's explanation as "somewhat thin," it denied the motion for a mistrial.  <u>Id.</u>

    B.    Discussion

    Although, under <u>Batson</u>, the prosecutor may not "rebut the defendant's prima facie case merely by denying that he had a discriminatory motive," 476 U.S. at 98, the second step of the <u>Batson</u> inquiry "does not demand an explanation that is persuasive, or even plausible."  <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995) (per curiam).  "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  <u>Hernandez</u>, 500 U.S. at 360.

    "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."  <u>Hernandez</u>, 500 U.S. at 365.  Therefore, findings of discriminatory intent "largely will turn on evaluation of credibility," <u>Batson</u>, 476 U.S. at 98, n.21, and are "subject to review under a deferential standard."  <u>Hernandez</u>, 500 U.S. at 264.  In order to grant relief under AEDPA, a federal habeas court must find the state court decision that a race-neutral reason was credible to be "an unreasonable

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

determination of the facts in light of the evidence presented in the State court proceeding." Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting 28 U.S.C. § 2254(d)(2)). Nonetheless, the "court must evaluate the record and consider each explanation within the context of the trial as a whole because '[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) (quoting Hernandez, 500 U.S. at 363) (alterations in original).

As the State acknowledges, the Supreme Court has not established whether a trial court's determination that a prosecutor's reasons for striking a juror were genuine should be reviewed under 28 U.S.C. § 2254(d)(2) or the more deferential standard set out in 28 U.S.C. § 2254(e)(1). However, this Court need not address the question, because it finds that Gonzales is not entitled to relief under the more lenient standard set out in 28 U.S.C. § 2254(d)(2).[7]

The California Court of Appeal held that "there is nothing to undermine the trial court's implicit determination that the proffered race-neutral reasons were sincere and genuine." Respondent's Ex. 7, Appx. A at 14. Therefore the California court held, "In light of the record and the defer[ential] standard of review, we see no improper use of peremptory challenges." Id. at 15. The Court of Appeal held, "With respect to Luis G., the

---

[7]The Court notes that in Kesser v. Cambra, 465 F.3d 351, 358 n.1 (9th Cir. 2006) (en banc), the Ninth Circuit suggested that § 2254(d)(2) applies in situations, such as this one, where the challenge is "based entirely on the state record."

18

United States District Court
For the Northern District of California

prosecutor had a legitimate concern over a highly educated man who seemed to have trouble holding even a clerical position--indeed, even completing probation.  The prosecutor was also concerned that Luis G. was educated in sociology which . . . could indicate a more liberal point of view." Id. at 14.  With respect to Ms. J., the California court held that

> the prosecutor had a legitimate concern her sociology
> training would make her inclined to be more liberal.
> He also had input from his own spouse how a female
> juror would react to a fact pattern involving
> harassment of a family with a young daughter.  This
> factor is perhaps enhanced by [Ms.] J.'s pregnancy.
> And [Ms.] J. had a strong feeling that a stalker and
> harasser in her relative's case should have been
> jailed sooner, a feeling which clearly would cause a
> prosecutor to suspect sympathy for defendant - whose
> defense was no doubt going to be that he killed to
> protect himself and his daughter.

Id. at 15.

Gonzales argues that the prosecutor's reasons for removing Mr. G. and Ms. J. from the jury were pretextual.  First, Gonzales questions the prosecutor's explanation that he did not want Mr. G. on the jury because, despite being highly educated, Mr. G. was not hired for a clerical position at the post office following the probationary period.  Gonzales argues that the trial court's comment that the prosecutor had, in another trial, stated that he did not want somebody hired by the post office on his jury belies the sincerity of the explanation with respect to Mr. G.  However, the prosecutor did not explain his challenge based on Mr. G.'s inability to obtain work at the post office in particular.  Rather, the prosecutor was concerned that Mr. G. was unable to pass the probationary period for a clerical job despite his level of

education.

Gonzales next argues that the prosecutor's race-neutral reasons for striking Ms. J. from the jury were pretextual.  He argues that the record does not support the prosecutor's stated belief that Ms. J. might be biased against law enforcement.  The prosecutor cited Ms. J.'s belief that law enforcement could have apprehended the individual who was stalking one of her relatives as well as Ms. J.'s training in sociology as indicators that she might be biased against law enforcement.  The state court reasonably found that these factors provide a sufficient basis for the prosecutor's belief.  Gonzales also argues that the prosecutor's statement that his wife told him that he should not allow women on the jury is evidence of impermissible gender discrimination. However, there is no evidence that the prosecution actually struck all of the women from the jury.  Moreover, the prosecutor explained that he struck Ms. J. because she reminded him of his wife, not because she was a woman.

The Court finds that it was not unreasonable for the trial court to credit the prosecutor's race-neutral reasons for striking Mr. G. and Ms. J. from the jury.

III. Evidence and Instruction Regarding Fabrication of Evidence

At trial, Gonzales objected to the introduction of the letter and Gustavo's testimony that Gonzales had asked him to give it to his sister because such evidence was "highly prejudicial."  R.T. at 451.  In addition, he argued that the information in the letter was not inconsistent with Maria's testimony.  The trial court overruled the objection, stating that the document would have Maria say "that

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

she did not see what was going on and therefore she felt she could not be a valid witness." Id.  In contrast, the court noted, "At her testimony two days ago she testified that she did in fact see what was happening."  Id.  Therefore, the court permitted the prosecution to call Gustavo to testify about the letter and to put into evidence an English translation of the letter.  The court later instructed the jury as follows: "If you find that a defendant attempted to or did persuade a witness to testify falsely or attempted to or did fabricate evidence to be produced at trial, that conduct may be considered by you as a circumstance tending to show a consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any are for you to decide."  R.T. 1106; see CALJIC No. 2.04.  Counsel did not object to the instruction.[8]

On direct appeal, the California Court of Appeal held that Gonzales had abandoned his argument that introduction of the letter was more prejudicial than probative, in violation of California Evidence Code § 354.  In addition, the Court of Appeal noted that, although Gonzales initially argued that the description of the events contained in the letter was consistent with Maria's testimony, he later conceded that the two versions were not consistent.  Nonetheless, the Court of Appeal held that the "letter clearly contradicts the fundamentals of Maria's trial testimony." Respondent's Exhibit 7, App. A at 16.  Moreover, the Court of

---

[8]The Court of Appeal noted that there had been no objection, but exercised its discretion pursuant to California Penal Code § 1259 to consider the claim.  Respondent's Exhibit 7, App. A at 15 n.6.

21

**United States District Court**
For the Northern District of California

Appeal held that "the inference may fairly be made from the testimony of Gustavo, and the existence of the letter, that defendant drafted an exculpatory document which would have refuted the core of Maria's expected damaging trial testimony, and wanted to make it look like she had written it in her own hand." <u>Id.</u> The Court of Appeal discounted Gonzales' argument that he had given "the letter to Gustavo simply to have Maria determine if it set forth a correct version of her story." <u>Id.</u> at 16 n.7. Therefore, the Court of Appeal rejected Gonzales' argument that there was no evidentiary basis for CALJIC No. 2.04. The Court of Appeal further stated that, even if it was improper to instruct the jury with CALJIC No. 2.04, there was sufficient alternative evidence to support the conviction and any error was therefore harmless.

Gonzales again argues that the introduction of the letter and Gustavo's testimony was prejudicial and the subsequent instruction regarding the fabrication of evidence was a violation of his right to due process. However, Gonzales' argument is based on his position that the "trial judge erred in reaching a conclusion that the defendant in this case attempted to fabricate evidence and then in it's [sic] decision that followed, allowed the jury to consider it as consciousness of guilt." Amended Petition at 93. The court did not make such a conclusion. Rather, the court instructed jurors that <u>if</u> they found that Gonzales had attempted to fabricate evidence, they could consider whether such actions were evidence of a consciousness of guilt. As Gonzales points out, he presented his explanation that he drafted the letter only to seek confirmation from Maria of what Gustavo told Gonzales Maria had seen. The jury

22

1  was able to consider and weigh the credibility of Gonzales'

2  explanation for his actions in reaching its verdict.

3      Gonzales would be entitled to federal habeas relief based on

4  the admission of the testimony and evidence only if its admission

5  "so fatally infected the proceedings as to render them

6  fundamentally unfair." Gonzalez v. Knowles, 515 F.3d 1006, 1011

7  (9th Cir. 2008) (quoting Jammal v. Van de Kamp, 926 F.2d 9818, 920

8  (9th Cir. 1991)).  "Only if there are no permissible inferences the

9  jury may draw from the evidence can its admission violate due

10 process." Jammal, 926 F.2d at 920.  Here, a permissible inference

11 from the evidence was that Gonzales attempted to fabricate evidence

12 to challenge Maria's testimony.

13     The state court was not unreasonable in finding that neither

14 the admission of evidence of the letter Gonzales gave to Gustavo

15 nor the jury instruction related to that evidence violated

16 Gonzales' right to due process.

17                              CONCLUSION

18     For the reasons set forth above, Gonzales' amended petition

19 for writ of habeas corpus is DENIED (Docket No. 16).  The Clerk

20 shall enter judgment against Petitioner and close the file.  The

21 parties shall bear their own costs.

22     IT IS SO ORDERED.

23

24 Dated:  10/30/08                 _____

25                                  CLAUDIA WILKEN
                                    United States District Judge

26

27

28                              23

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

GONZALES,

        Plaintiff,

  v.

CAREY et al,

        Defendant.

_____/

Case Number: CV04-05474 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 30, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Luis  Gonzales T-55033
1636 - 104th Avenue
Oakland,  CA 94603

Nancy Hsiao-Hui Tung
CALIFORNIA ATTORNEY GENERAL'S OFFIC
455 Golden Gate Avenue, Suite 11000
San Francisco,  CA 94102-7004

Peggy S. Ruffra
CA State Attorney's Office
455 Golden Gate Avenue
Suite 11000
San Francisco,  CA 94102-7004

Dated: October 30, 2008

        Richard W. Wieking, Clerk
        By: Sheilah Cahill, Deputy Clerk

24